THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
EDWARD R. WEGMAN, JR., Defendant-Appellant.

Fifth District    No. 80-222

Opinion filed November 5, 1981.

John H. Reid and Patrick M. Carmody, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Charles V. Romani, Jr., State's Attorney, of Greenville (Martin N. Ashley, Gillum Ferguson, and Stephen E. Norris, all of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE WELCH delivered the opinion of the court:

Edward Wegman, Jr., the defendant, was charged with reckless homicide and murder of his brother, Kenneth Wegman, and August F. Haislar, for the events of October 27, 1979. The defendant moved before trial to suppress the fruits of a consent search of his car and his apartment. The motions were denied. One murder count and the two reckless homicide charges were dismissed by the State and the matter proceeded on

two counts of murder. The defendant, his lawyer, and the State's Attorney stipulated to the facts of the case in a bench trial, with the recommendation of a 25-year sentence in the event of conviction. He was found guilty on both counts and sentenced to 25 years on each, the sentences to run concurrently.

The only issue raised on appeal is the correctness of the denial of the motion to suppress the evidence seized in the search of the defendant's car and apartment.

The facts are as follows: Kenneth Wegman and August F. Haislar were riding a motorcycle in Bond County, Illinois, on the night of October 27, 1979. They were in a head-on collision with a 1971 Plymouth automobile. They were found dead at the scene with the abandoned car. The car was traced to Kenneth's brother Edward. A warrant was issued for the arrest of Edward Wegman on a charge of reckless homicide. Edward Wegman lived in St. Charles, Missouri. At about 5:45 p.m., on November 2, 1979, St. Charles police officers Robert Eppes, Richard Tiemann, and Mark Schulte arrested Wegman at his home in response to a teletype message about the warrant. They told him the warrant was for reckless homicide, searched him, handcuffed him, and read him his *Miranda* warnings. They asked him if he knew what the warrant was all about and he said no. They took him to the St. Charles Police Department and turned him over to the booking officer to be "booked in."

At about 7:15 p.m. that evening, agents Gary Leming and Jimmy Bivens of the Illinois Department of Law Enforcement, Division of Criminal Investigation, arrived at the St. Charles police station in an effort to interview Edward Wegman. Wegman was brought out to an interview room, where Leming advised him of his *Miranda* rights (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602). He went over a warning form with Wegman and had him initial each of six items as an indication that Wegman understood them; then Wegman signed the form at 7:29 p.m. The form was witnessed by Leming and Bivens.

Leming then read a copy of the arrest warrant to Wegman and asked if he understood what it was about. Wegman said that he did not. Leming asked if Wegman knew that his brother and Augie Haislar were dead. He said, "yes—are you going to try to pin that on me?" Wegman asked the officers, "What do you have on me?" and "Who are the witnesses?" Then Wegman told Leming "that he wanted to talk to an attorney and I [Leming] told him that would be okay."

Leming stopped questioning Wegman at that point. No attorney was supplied to Wegman, and he apparently did not talk to an attorney until after his initial appearance before a judge in Bond County on November 9, 1979.

Immediately after Leming stopped questioning Wegman on No-

vember 2, Wegman asked him, "What is my mom and dad thinking about the situation?" Leming replied that he did not know. Wegman then said that he did not care because his parents never did anything to him or for him. Leming again stopped talking with Wegman. A few minutes later Leming asked Wegman if he would give them permission to search his apartment and car. Leming read to Wegman the consent forms which stated that he had a right to refuse the search and that they would need a warrant if he did not consent. The form did not mention anything about the required showing of probable cause in order to obtain a search warrant. Wegman signed the forms, which are dated November 2, 1979. No time is indicated on the form. No other conversation took place between Wegman and the agents at that time. The entire interview, including the consents to search, only lasted about 20 minutes according to police testimony.

The officers searched Wegman's 1978 Pontiac, which was in police custody. They seized a license plate which was lying on the floor.

Officers Leming, Bivens, and Illinois State Trooper Gross conducted a search of Wegman's St. Charles apartment and seized two insurance policies on the life of Kenneth Wegman with Edward Wegman as beneficiary and a money order receipt. They also seized a pair of blue jeans and a vinyl jacket which had blood on them. They saw a white cotton glove which they did not seize until a subsequent search on November 5, 1979.

The question is whether the articles found as a result of defendant's having signed a consent to search form must be suppressed because the defendant had previously invoked his right to an attorney and the police resumed questioning before the defendant was afforded his right to counsel. The question involves elements of the fourth, fifth, and sixth amendment constitutional guarantees, as extended to the States by the fourteenth amendment.

■■ The fourth amendment guarantees against warrantless searches and seizures do not apply in cases where a valid consent to search has been obtained by the searching authorities. Wegman did execute consents to search the car and the apartment. The consent forms included an acknowledgement of the right not to consent to the search. The question is, did the fact that he was in custody, charged with a crime, and had requested a lawyer, negate his consent given without a lawyer?

In recognition of his fifth amendment guarantee against compulsory self-incrimination, Wegman was given his *Miranda* warnings. He said he wanted a lawyer and the police stopped questioning him. He asked them what his parents thought of the situation and they said they didn't know. No violation of *Miranda* occurred, because he initiated the conversation. (*Edwards v. Arizona* (1981), ___ U.S. ___, ___, 68 L. Ed. 2d 378, 386, 101 S. Ct. 1880, 1884-85.) They stopped talking again. But then the agents

approached him and asked for his consent to search the car and the apartment. No lawyer had talked with Wegman. There is no indication that he was given a phone to call a lawyer himself or that the police made any effort to call one for him. The police did not interrogate him about the offense, but they did ask for his consent to searches which had the potential of turning up self-incriminating evidence.

The sixth amendment guarantees a right to counsel to an accused. *Miranda* required that if a defendant, in response to being told that he had a right to one, asked for a lawyer, all questioning must cease until he had talked with a lawyer. The penalty for violation of the rule was exclusion from evidence at trial of any statements or communications made by the defendant after he asked for a lawyer and before he got one. *Miranda v. Arizona* (1966), 384 U.S. 436, 475, 16 L. Ed. 2d 694, 724, 86 S. Ct. 1602, 1628.

Does the protection against "compulsory self-incrimination" and guarantee of right to counsel of *Miranda* extend beyond statements to evidence uncovered by a search? *Miranda* is generally thought to be limited to protecting statements and "communications." (*Schmerber v. California* (1966), 384 U.S. 757, 764, 16 L. Ed. 2d 908, 916, 86 S. Ct. 1826, 1832; *United States v. Lemon* (9th Cir. 1977), 550 F.2d 467; *People v. Phillips* (1979), 197 Colo. 546, 594 P.2d 1053.) The Supreme Court has held that *Miranda*-type warnings, including the right to refuse consent, are not required prior to obtaining a consent to search. *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 247, 36 L. Ed. 2d 854, 874, 93 S. Ct. 2041, 2058.

That court has not been presented with the question as here, however, of whether the *Miranda* warnings, if given, extend to the consent to search.

■■ General rules governing validity of consents to search were set out by the Supreme Court in *Schneckloth*. The consent to search must be given voluntarily, that is it must not be induced by explicit or implicit means or by implied threat, force or coercion. The voluntariness of the consent is to be determined by an examination of the totality of the circumstances. Schneckloth was not in custody at the time of the consent to search, and for that reason the argument has been made that *Miranda*, not *Schneckloth*, should apply to custody consent situations. The California Appellate Court said:

"Reasonable minds may differ as to exactly what the Supreme Court attempted to achieve in *Miranda*.
* * *
However one interprets *Miranda*, what becomes subject to exclusion * * * are 'statements, whether exculpatory or inculpatory, stemming from custodial interrogation.'

* * *

A consent to search, as such, is neither testimonial, nor communicative in the Fifth Amendment sense.

* * *

The fact that the search leads to incriminating evidence does not make the consent testimonial * * *." *People v. Thomas* (1970), 12 Cal. App. 3d 1102, 1110, 91 Cal. Rptr. 867, 872.

The Colorado Supreme Court has stated that "* * * rights afforded under *Miranda v. Arizona, supra,* do not extend to the Fourth Amendment." *People v. Phillips* (1979), 197 Colo. 546, 549, 594 P.2d 1053, 1054.

■■ If *Miranda* does extend to consents to search, then the agents acted improperly in eliciting the consents after Wegman had exercised his *Miranda* right by requesting an attorney. From our research this appears to be a case of first impression in Illinois, and we cannot find that the United States Supreme Court has made the matter clear.

> "The ruling of the United States Supreme Court in *Miranda v. Arizona, supra* was designed as a prophylactic rule to correct and prevent abusive police practices in the area of confessions. The Supreme Court has not acted to extend the rule in *Miranda* to the Fourth Amendment. In the absence of such an extension of the rule in *Miranda* by the Supreme Court, this court shall continue to adhere to the rule that in order for a search with consent to be reasonable the consent must be voluntary, and that the question of whether the consent was freely and intelligently given is to be determined according to the circumstances in each case." (*Phillips v. People* (1969), 170 Colo. 520, 527-28, 462 P.2d 594, 597.)

We agree with the Colorado Supreme Court that lacking clearer direction from the Supreme Court, our proper inquiry is into the voluntariness of the consent to search. Wegman was read aloud and had an opportunity to read silently a consent to search form which stated that he had a right not to consent to a search and that a search warrant would be required if he did not. He had not been in custody long, and had indicated his intent to exercise his right to remain silent and to consult an attorney. The agents carefully stopped questioning him when he asked for an attorney. Wegman initiated some conversation afterwards by asking about his parents. No evidence of physical abuse or coercion was present.

■■ We find that, under the totality of the circumstances, the defendant's consents to search were voluntary. Therefore, the fruits of the searches should not be suppressed. Accordingly, we affirm the trial court's decision.

Affirmed.

JONES and HARRISON, JJ., concur.